# IN THE UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| THE MUSEUM OF MODERN ART, | |
| Plaintiff, | |
| v. | Case No.   1:18-cv-03364-LLS |
| MOMACHA IP LLC and MOMACHA OP LLC, | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF THE MUSEUM OF MODERN ART'S MOTION FOR
## PRELIMINARY INJUNCTION

MORRISON & FOERSTER LLP

Jamie A. Levitt
250 West 55th Street
New York, New York  10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Email: JLevitt@mofo.com

Jennifer Lee Taylor (*pro hac vice* pending)
Sabrina A. Larson (*pro hac vice* pending)
425 Market Street
San Francisco, California  94105
Telephone:  (415) 268-7000
Facsimile:  (415) 268-7522
Email: JTaylor@mofo.com
        SLarson@mofo.com

Attorneys for Plaintiff
THE MUSEUM OF MODERN ART

<h1 style="text-align:center">TABLE OF CONTENTS</h1>

<strong>Page</strong>

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ............................................................................................... 2

LEGAL STANDARD ....................................................................................................... 7

ARGUMENT ..................................................................................................................... 8

I.     MOMA IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS ......... 8

     A.     MOMA Is Likely To Succeed On Its Trademark Infringement Claims ................................................................................................... 8

          1.     MoMA Has Prior, Valid Protectable Rights in the MoMA Marks ................................................................................... 9

          2.     Defendant's Adoption of Identical and Strongly Similar Marks Is Presumed to Cause Confusion ..................................... 10

          3.     The *Polaroid* Factors Demonstrate a Likelihood of Confusion ................................................................................ 10

               a.     The MoMA and MoMaCha marks are identical............. 11

               b.     The services are closely related. ..................................... 13

               c.     MoMA's Marks are extremely strong............................. 14

               d.     Actual confusion between the parties' marks has occurred........................................................................... 15

               e.     MoMaCha adopted the MOMACHA Infringing Marks in bad faith. ...................................................... 16

               f.     The relevant consumer group is not particularly sophisticated................................................................... 18

               g.     The quality of MoMaCha's services is not equal to MoMA's.................................................................. 19

               h.     The remaining Polaroid factor is not relevant................. 19

     B.     MoMA Is Likely To Succeed On Its Unfair Competition Claim ........... 19

     C.     MoMA Is Likely To Succeed On Its Trademark Dilution Claim........... 20

II.    MOMA WILL CONTINUE TO SUFFER IRREPARABLE HARM IF MOMACHA IS NOT ENJOINED ................................................................. 22

     A.     Actual Confusion Has Caused MoMA Irreparable Harm and Will Continue To Do So Unless MoMaCha Is Enjoined................................. 22

     B.     In Addition to Actual Confusion, There Is a Strong Likelihood of Confusion, Which Will Cause Irreparable Harm if MoMaCha Is Not Enjoined ............................................................................................ 24

III.   MOMA HAS RAISED SERIOUS QUESTIONS ON THE MERITS OF ITS CLAIMS AND THE BALANCE OF HARDSHIPS TIPS IN ITS FAVOR ...................................................................................................... 24

CONCLUSION................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1–800 Contacts, Inc. v. WhenU.Com, Inc.*,
    414 F.3d 400 (2d Cir. 2005)..............................................................................7

*Abdul Wali v. Coughlin*,
    754 F2d 1015 (2d Cir. 1985)............................................................................7

*Am. Express Co. v. Am. Express Limousine Serv.*,
    772 F. Supp. 729 (E.D.N.Y.1991) .............................................................11, 12

*Am. Ort, Inc. v. Israel*,
    No. 07 CV 2332(KMK), 2007 WL 2049733 (S.D.N.Y. July 17, 2007)...............16

*Bellbrook Dairies, Inc. v. Hawthorn-Mellody Farms Dairy, Inc.*,
    253 F.2d 431 (C.C.P.A. 1958) .........................................................................11

*Blue & White Food Prods. Corp. v. Shamir Food Indus., Ltd.*,
    350 F. Supp. 2d 514 (S.D.N.Y. 2004)..............................................................7

*Burberry Ltd. & Burberry USA v. Designers Imports, Inc.*,
    No. 07 Civ. 3997(PAC), 2010 WL 199906 (S.D.N.Y. Jan. 19, 2010) ...............20

*Burberry Ltd. v. Euro Moda, Inc.*,
    No. 08 Civ. 5781(CM), 2009 WL 1675080 (S.D.N.Y. June 10, 2009)...............22

*Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*,
    830 F.2d 1217 (2d Cir. 1987)...........................................................................20

*Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*,
    794 F.2d 38 (2d Cir. 1986)...............................................................................24

*Clinique Labs., Inc. v. Dep Corp.*,
    945 F. Supp. 547 (S.D.N.Y.1996).....................................................................11

*Gruner + Jahr USA Publ'g v. Meredith Corp.*,
    991 F.2d 1072 (2d Cir. 1993).....................................................................8, 14

*GTFM, Inc. v. Solid Clothing Inc.*,
    215 F. Supp. 2d 273 (S.D.N.Y. 2002)..............................................................10

*Herbko Int'l, Inc. v. Kappa Books, Inc.*,
    308 F.3d 1156 (Fed. Cir. 2002).........................................................................13

*Jahr USA Publ'g v. Meredith Corp.*,
   991 F.2d 1072 (2d Cir. 1993)..................................................................................14

*Juicy Couture, Inc. v. Bella Int'l Ltd.*,
   930 F. Supp. 2d 489 (S.D.N.Y. 2013)......................................................................22

*La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.*,
   495 F.2d 1265 (2d Cir. 1974)....................................................................................9

*Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*,
   192 F.3d 337 (2d Cir. 1999)....................................................................................14

*Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*,
   378 F. Supp. 2d 448 (S.D.N.Y. 2005)........................................................................8

*Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*,
   97 F. Supp. 3d 485 (S.D.N.Y. 2015)........................................................................10

*Louis Vuitton Malletier v. Burlington Coat Factory*,
   426 F.3d 532 (2d Cir. 2005)....................................................................................25

*Marks Org., Inc. v. Joles*,
   784 F. Supp. 2d 322 (S.D.N.Y. 2011)................................................................22, 23

*McGregor-Doniger Inc. v. Drizzle Inc.*,
   599 F.2d 1126 (2d Cir. 1979)..................................................................................15

*Metlife, Inc. v. Metro. Nat'l Bank*,
   388 F. Supp. 2d 223 (S.D.N.Y. 2005)......................................................................17

*Microsoft Corp. v. AGA Sols., Inc.*,
   589 F. Supp. 2d 195 (E.D.N.Y. 2008) .......................................................................8

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*,
   818 F.2d 254 (2d Cir. 1987)........................................................................11, 13, 14

*N.Y. City Triathlon, LLC v. NYC Triathlon Club, Inc.*,
   704 F. Supp. 2d 305 (S.D.N.Y. 2010).............................................................. *passim*

*Nabisco, Inc. v. PF Brands, Inc.*,
   50 F. Supp. 2d 188 (S.D.N.Y.), *aff'd*, 191 F.3d 208 (2d Cir. 1999) ......................21

*Narwood Prods., Inc. v. Lexington Broad. Servs., Co.*,
   541 F. Supp. 1243 (S.D.N.Y. 1982)....................................................................18, 24

*NYP Holdings v. N.Y. Post Publ'g Inc.*,
   63 F. Supp. 3d 328 (S.D.N.Y. 2014)........................................................................22

*Omega Importing Corp. v. Petri-Kine Camera Co.*,
451 F.2d 1190 (2d Cir. 1971)............................................................................18

*Paco Sport, Ltd. v. Paco Rabanne Parfums*,
86 F. Supp. 2d 305 (S.D.N.Y.), *aff'd*, 234 F.3d 1262 (2d Cir. 2000).....................15

*Paddington Corp. v. Attiki Importers & Distribs., Inc.*,
996 F.2d 577 (2d Cir. 1993)............................................................................10

*Philip Morris USA Inc. v. Felizardo*,
No. 03 Civ. 5891(HB), 2004 WL 1375277 (S.D.N.Y. June 18, 2004).................20

*Polaroid Corp. v. Polarad Elecs. Corp.*,
287 F.2d 492 (2d Cir. 1961)............................................................................11

*Ritani, LLC v. Aghjayan*,
880 F. Supp. 2d 425 (S.D.N.Y. 2012).................................................................8

*Savin Corp. v. Savin Grp.*,
391 F.3d 439 (2d Cir. 2004)....................................................................15, 16, 18

*Simon & Schuster, Inc. v. Dove Audio, Inc.*,
970 F. Supp. 279 (S.D.N.Y. 1997)....................................................................16

*Star Indus., Inc. v. Bacardi & Co.*,
412 F.3d 373 (2d Cir. 2005)............................................................................14

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*,
588 F.3d 97 (2d Cir. 2009)............................................................................19

*Tri-Star Pictures, Inc. v. Unger*,
14 F. Supp. 2d 339 (S.D.N.Y. 1998)..................................................................20

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
505 U.S. 763 (1992)......................................................................................14

*Virgin Enters. Ltd. v. Nawab*,
335 F.3d 141 (2d Cir. 2003)..........................................................................8, 15

*Vox Amplification Ltd. v. Meussdorffer*,
No. CV 13-4922(ADS)(GRB), 2014 WL 558866 (E.D.N.Y. Feb. 11, 2014).........23

*Warner-Lambert Co. v. Northside Dev. Corp.*,
86 F.3d 3 (2d Cir. 1996)................................................................................25

*Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb, Inc.*,
698 F.2d 862 (7th Cir. 1983)..........................................................................25

**Statutes**

15 U.S.C.

   § 1057(c) ................................................................................................9
   § 1115(b) ...............................................................................................9
   § 1125(c) ...........................................................................................21, 22

**Other Authorities**

4 McCarthy on Trademarks and Unfair Competition, § 23:96 (5th ed. 2018) .............................18

## PRELIMINARY STATEMENT

A non-profit education corporation, The Museum of Modern Art ("MoMA") has an unparalleled commitment to sharing with the widest possible audience the complexity and wonders of modern and contemporary art. MoMA achieves this goal through its deep collections, its thoughtful exhibitions, and its broad array of educational programs. MoMA's visitors include native New Yorkers and tourists from around the United States and the world and it offers many programs with free or reduced admission, as well as online educational offerings, to make its exhibitions and programs available and accessible to all. MoMA supports a vibrant New York art scene and applauds emerging artists and independent art galleries. However, by intentionally copying the MoMA brand for their new art gallery and café, Defendants MoMaCha IP LLC and MoMaCha OP LLC ("Defendants" or "MoMaCha") are wrongfully profiting from a false association with MoMA at the expense of MoMA's audience, so their infringement of MoMA's trademarks must stop. Notably, this is the first lawsuit that MoMA has had to file to defend its famous brand and protect its visitors from confusion.

In an attempt to avoid this very scenario, MoMA contacted Defendants before they opened their business to the public to resolve the problem. But Defendants refused to stop using the infringing MoMaCha mark in connection with their art gallery and café, or to abandon the applications they had filed to register MOMA and MOMACHA as trademarks for their business. The reason is obvious: Defendants are counting on the connection to MoMA to generate business, which is precisely what the trademark laws are meant to prevent. Defendants' infringing acts are evident and numerous; indeed they even applied to register the *identical* MOMA trademark. Among other things, they chose a name and logo "MoMaCha" that they concede "mashes art and matcha," by incorporating MoMA's famous name. They chose to use

1

ITC Franklin Gothic—the commercial font that is closest to MoMA's own proprietary font—for their logo. An Internet search reveals that Defendants appear to have modified a prior MoMA visitor guide with their MoMaCha logo:

**<u>Infringing MoMaCha Image</u>**         **<u>MoMA Visitor Guide</u>**

          

(Declaration of Rob Baker ("Baker Decl.") ¶ 31.) And the list goes on. Their copying could not be more blatant or more prohibited by the trademark and unfair competition laws.

Not surprisingly, use of the confusingly similar MoMaCha name and logo has confused and will continue to confuse the public. Because MoMA has five locations of various types throughout New York, visitors from outside of New York are particularly susceptible to confusion as to whether a place that calls itself MoMa is affiliated with The Museum of Modern Art. As a café incorporating art, the public will almost certainly associate MoMaCha with MoMA. MoMA respectfully submits that Defendants' brazen use of MOMA and MOMACHA must be enjoined.

<u>**STATEMENT OF FACTS**</u>

**The Museum Of Modern Art's History And Mission**

MoMA is dedicated to being the foremost museum of modern art in the world. MoMA manifests this commitment by establishing, preserving, and documenting a permanent collection of the highest order that reflects the vitality, complexity and unfolding patterns of modern and

contemporary art; by presenting exhibitions and educational programs of unparalleled significance; by sustaining a library, archives, and conservation laboratory that are recognized as international centers of research; and by supporting scholarship and publications of preeminent intellectual merit. (*See* Baker Decl. ¶ 3.)

MoMA's world class art collection includes approximately 200,000 works of modern and contemporary art, including paintings, sculptures, drawings, prints, photographs, media and performance art works, architectural models and drawings, design objects, and films. It offers a range of programs and activities aimed at educating both the general public and different segments of the community in approaching and understanding modern and contemporary art, including online courses. (*Id*. ¶ 5.) MoMA also has one of the most active publishing programs of any U.S. art museum, and has published over 2,500 titles. (*Id*. ¶ 6.) In 2000, MoMA and P.S.1 Contemporary Art Center merged, creating the largest U.S. platform for contemporary art. Ten years later, P.S.1 was renamed MoMA PS1 to better reflect the affiliation between MoMA and P.S.1, which includes jointly curated initiatives, exhibits, and a shared website. (*Id*. ¶ 7.)

Since 1939, MoMA has been located at 11 West 53rd Street (the "Museum"). MoMA also owns a facility in Long Island City, Queens—MoMA QNS—where MoMA operated an exhibition space between 2002 and 2004. (*Id*. ¶ 9.) MoMA currently has over 120,000 members, with nearly 12 million visitors walking through its doors between 2014 and 2017, and approximately 2.2 million visitors since July 2017. (*Id*. ¶ 10.) MoMA's award-winning website, www.moma.org, has had over 13 million unique visitors in the past year. (*Id*.)

### The MoMA Brand

The Museum has been known as "MOMA" for nearly 50 years, with the name appearing on the building, and on banners, signs, and brochures. (Baker Decl. ¶ 11, Ex. 1.) MoMA

capitalized all of the letters in its logo until the mid-1980s, when it transitioned to "MoMA" with a lowercase "o." (*Id*. ¶ 12.) MoMA currently uses the iconic logo below (the "MoMA Logo"):



**MoMA**

(*Id*. ¶ 13.) The MoMA Logo itself has received significant press coverage, including in *The New York Times*. (*Id*.) MoMA's distinctive proprietary font was developed exclusively for MoMA and is based upon the Franklin Gothic font. (*Id*. ¶ 30.) Since 2013, MoMA has used versions of its proprietary font as the sole typeface for the majority of MoMA's exhibition identities to create visual consistency. (*Id*.) MoMA owns a number of federal trademark registrations and applications protecting its marks (collectively, with the MoMA Logo, the "MoMA Marks"), including the characters "MOMA," for a variety of museum services and goods and services related to museums. (*See* Declaration of Jamie A. Levitt ("Levitt Decl.") ¶¶ 3-8, Exs. A-F.) MoMA has used the MoMA Marks in virtually all communications with the public, press, artists, and sponsors since 1967. (Baker Decl. ¶ 14.) They are featured prominently on MoMA's website, and in a variety of materials, including signage, brochures, fliers, advertisements, and social media posts for educational programs, publications, retail merchandise, and amenities like restaurants, bars, cafés, and stores. (*Id*.) The MoMA Marks are also emblazoned by authorized licensees on numerous objects sold through MoMA Design Stores, third-party retailers, and online. (*Id*. Ex. 3.)

MoMA uses the MoMA Marks to promote its products and services through traditional print media, including publications like *The New York Times* and *The Wall Street Journal*,

MoMA's own newsletters, and through online digital media outlets. (*Id.* ¶ 15.) MoMA also advertises throughout New York, including in the subway and on billboards, and works closely with NYC & Company, the official destination marketing organization for New York City. (*Id.*) It also attends travel and tourism industry trade shows and distributes brochures for MoMA's gallery and dining services at major hotels and attractions, in key outdoor areas, and along the Amtrak Northeast corridor. (*Id.* Exs. 4-5.) In addition to its www.moma.org website and blogs, MoMA has an active social media presence, with over 5.5 million followers on Twitter, 3.4 million on Instagram, 1.96 million on Facebook, and almost 175,000 on YouTube. (*Id.* ¶ 16, Ex. 6.)

### Amenities At The Museum

Dining facilities are an important part of any museum's services, including MoMA's, and MoMA has long offered, and continues to offer, a variety of dining services to visitors. (Baker Decl. ¶ 18.) It currently has two cafés, Café 2 and Terrace 5, and two restaurants, The Bar Room and The Modern, within the Museum. (*Id.*) Between 1993 and 2002, the Sette MoMA restaurant operated within the Museum. (*Id.*) From 2002 to 2004 when the Museum operated out of MoMA QNS, there was a café located inside the MoMA QNS facility. (*Id.*) MoMA is especially proud of the fine dining experience offered at The Modern restaurant, founded by Danny Meyer's Union Square Hospitality Group and operated by his ArtFood LLC, which has earned four James Beard Foundation Awards, three stars from *The New York Times*, and two Michelin stars. (*Id.* ¶ 19.) The Modern is open to museum visitors and the public alike. (*Id.*)

MoMA operates three MoMA Design Stores in New York City: one inside the Museum, one across the street from the Museum, and the third downtown in Soho. (*Id.* ¶ 20.) They feature curated products and products developed by MoMA, ranging from reproductions of

MoMA artwork, home items, kitchenware, coffee and tea articles to jewelry, accessories, books, and kids' items.  (*Id*.)  MoMA Design Store products are also available online.  (*Id*. Ex. 10.)

**Defendants' Business and Willful, Wrongful Conduct**

Defendants operate an art gallery and café, called MoMaCha.  (Baker Decl. ¶ 21.)  It opened early this month in storefront space at The Hole art gallery in the Lower East Side of Manhattan.  (*Id*.)  They are also online, at https://momacha.com/, where they promote the MoMaCha art gallery and café, which currently features a contemporary artist.  (*Id*. ¶ 22, Ex. 11.)  They also promote their MoMaCha business through social media such as Facebook, Instagram, and Twitter.  (*Id*. ¶ 24.)  Their Instagram handle is @momacha, and on both Instagram and Twitter, the hashtags #MoMaCha and #momacha are used to promote and identify the MoMaCha gallery and café.  (*Id*. Ex. 13.)  They plan to open additional MoMaCha art-cafés in New York City this year.  (*Id*. ¶ 25, Ex. 14.)  Like MoMA, they use their logo both horizontally and vertically:

 

(*Id*. ¶¶ 26-27.)  The similarities to the MoMA Logo are too striking to be a coincidence.  (*Id*. ¶ 28.)  Defendants have also applied to register MOMA—a trademark identical to the MOMA word mark owned by MoMA—as a trademark for café and other services (collectively with MOMACHA, the "MOMACHA Infringing Marks").  (Levitt Decl. ¶ 10, Ex. H.)

**Confusion and Resulting Harm to MoMA**

Defendants' infringement is already causing confusion and is likely to continue to cause

confusion among consumers who will believe that the MoMaCha art gallery and café is affiliated with MoMA.  (Baker Decl. ¶ 36.)  Because of its reputation as a world-class museum, MoMA—including the Museum itself, the MoMA Design Stores, and MoMA PS1—is a destination for visitors from outside of New York City.  (*Id*.)  If these visitors learn of the MoMaCha gallery and café, they are likely to believe that it is another offering from MoMA.  (*Id*.)  Defendants in fact have deliberately created a name that will be understood as a play on the MoMA Marks—similar to MoMA's own MoMA QNS and MoMA PS1—by combining the MOMA prefix with the word for "tea."  (*Id*. ¶ 37.)  The fact that they show *art* in their café, and are located in the storefront for an *art* gallery, exacerbates the certainty that visitors will assume a connection between MoMA and MoMaCha.  (*Id*.)  If visitors or consumers associate MoMA and MoMaCha, MoMA will lose control of its world-class reputation and its brand will be tarnished.  (*Id*. ¶ 39.)

## LEGAL STANDARD

Under Second Circuit law, a district court may grant a preliminary injunction if the moving party establishes "(1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly toward the party requesting the preliminary relief."  *1–800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 406 (2d Cir. 2005) (citation omitted).  A plaintiff "need not show that success is an absolute certainty."  *Abdul Wali v. Coughlin*, 754 F2d 1015, 1025 (2d Cir. 1985).  Courts in this District routinely grant preliminary injunctions in cases involving the types of claims asserted here.  *See, e.g.*, *N.Y. City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 313 (S.D.N.Y. 2010) (granting preliminary injunction where "NYC Triathlon Club" infringed THE NEW YORK CITY TRIATHLON); *Blue & White Food Prods.*

*Corp. v. Shamir Food Indus., Ltd.*, 350 F. Supp. 2d 514 (S.D.N.Y. 2004) (granting preliminary injunction where "SHAMIR FOOD" infringed SHAMIR SALAD).

## ARGUMENT

## I.   MOMA IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS

### A.  MOMA Is Likely To Succeed On Its Trademark Infringement Claims

MoMA's Lanham Act trademark infringement claims are "analyzed under the familiar two-prong test described in *Gruner + Jahr USA Publ'g v. Meredith Corp.*"  *See Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003) (citation omitted).  "The test looks first to whether the plaintiff's mark is entitled to protection, and second to whether defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods."  *Id.* (citing *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1074 (2d Cir. 1993)).  Whether brought under Section 32 or 43(a), the legal standard for liability "is the same."  *See Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*, 378 F. Supp. 2d 448, 454 (S.D.N.Y. 2005); *Microsoft Corp. v. AGA Sols., Inc.*, 589 F. Supp. 2d 195, 203 (E.D.N.Y. 2008) ("The same facts that establish [defendants] violated section 32 of the Lanham Act establish[ ] that they violated section 43(a).").  Because the MoMA Marks are entitled to protection and Defendants' use of the MOMACHA Infringing Marks for an art-café is likely to cause confusion, MoMA is likely to succeed on its Lanham Act claims.  *See id.*

"[T]he elements of a cause of action for New York common law infringement . . . mirror the requirements of claims stated under the Lanham Act and similarly require that a party demonstrate a valid, protectable mark and a likelihood of confusion between the marks of the alleged infringer and the charging party."  *Ritani, LLC v. Aghjayan*, 880 F. Supp. 2d 425, 448 (S.D.N.Y. 2012).  Thus, MoMA is equally likely to succeed on its common law claims.

1.  MoMA Has Prior, Valid Protectable Rights in the MoMA Marks

MoMA applied for federal registration of the MoMA Marks as early as November 22, 1989—for "[r]etail store services in the field of artwork, stationery, books, housewares, gifts and toys and other general merchandise" under the MoMA brand—long prior to the recent launch of Defendants' business.  (Levitt Decl. ¶ 4, Ex. B.)  MoMA owns a number of additional federal registrations, and a pending application, for the MoMA Marks for a variety of museum-related goods and services.  (*Id.* ¶¶ 3-8, Exs. A-F.)  As such, MoMA has priority.  *See* 15 U.S.C. § 1057(c) (filing of application confers nationwide priority rights).  Because MoMA filed affidavits under Section 15 of the Lanham Act, its registrations for MOMA, MOMA DESIGN STORE, MOMAQNS, and MOMA PS1 are incontestable and conclusive evidence of their validity and protectability.  *See* 15 U.S.C. § 1115(b) (certificate of registration is conclusive evidence of validity, ownership, and of "the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration").

MoMA also has common law rights in the MoMA Marks because MoMA has been continuously using the MoMA Marks in commerce since 1967 (Baker Decl. ¶ 14), well prior to Defendants' first use of the MOMACHA Infringing Marks.  *See La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271 (2d Cir. 1974) ("The user who first appropriates the mark obtains an enforceable right to exclude others from using it, as long as the initial appropriation and use are accompanied by an intention to continue exploiting the mark commercially.").  As described above, MoMA has offered not only its hallmark modern art museum services to the public, it has also become known for its award-winning design stores, educational programs, and restaurants.

MoMA therefore has prior, valid protectable rights in the MoMA Marks in connection

with museums and related goods and services, including restaurants, bars, cafés, publications, merchandise, and educational programs as a result of registration and common law use.

2.    Defendant's Adoption of Identical and Strongly Similar Marks Is Presumed to Cause Confusion

Courts have held that where a defendant adopts strongly similar marks, a likelihood of confusion is presumed as a matter of law. *See Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 497 (S.D.N.Y. 2015) (holding that "[t]he evidence demonstrat[ing] that Sunny intentionally attempted to appropriate the ubiquitous LOUIS VUITTON mark through the use of its confusingly similar LOUIS V and LOUIS VALENTIN marks" "gives rise to a presumption in favor of a likelihood of confusion"); *GTFM, Inc. v. Solid Clothing Inc.*, 215 F. Supp. 2d 273, 297 (S.D.N.Y. 2002) (where similarities "are so strong that they could only have occurred through deliberate copying" "a presumption arises that the copier has succeeded in causing confusion") (citation omitted); *see also Paddington Corp. v. Attiki Importers & Distribs., Inc.*, 996 F.2d 577, 586-87 (2d Cir. 1993) ("Where such prior knowledge is accompanied by similarities so strong that it seems plain that deliberate copying has occurred, we have upheld findings of bad faith," and "[w]here a second-comer acts in bad faith and intentionally copies a trademark or trade dress, a presumption arises that the copier has succeeded in causing confusion.").

In view of the conspicuous similarities between the MoMA Marks and the MOMACHA Infringing Marks along with Defendants' familiarity with the MoMA Marks, discussed in detail below, *infra* Sections I.A.3.a and I.A.3.e, there is no question that Defendants deliberately chose to imitate the MoMA Marks. A likelihood of confusion is therefore presumed.

3.    The *Polaroid* Factors Demonstrate a Likelihood of Confusion

Where likelihood of confusion is not presumed under *Gruner*, the Second Circuit has

articulated eight factors (referred to as "the *Polaroid* factors") to be considered when assessing the likelihood of consumer confusion: (1) strength of plaintiff's mark; (2) similarity of the marks; (3) competitive proximity of products or services; (4) likelihood that plaintiff will "bridge the gap" and offer a product or service similar to defendant's; (5) actual confusion; (6) good faith on defendant's part; (7) quality of the defendant's products or services; and (8) sophistication of buyers. *See Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961). Here, even if not presumed, the *Polaroid* factors weigh in favor of finding a likelihood of confusion.

a.      <em>The MoMA and MoMaCha marks are identical.</em>

The degree of similarity between marks is one of "the most significant [factors] in determining the likelihood of confusion." *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987) (citing *Vitarroz v. Borden, Inc.*, 644 F.2d 960, 966 (2d Cir. 1981)). "[M]arks are considered similar when they are similar in appearance, sound, and meaning." *Clinique Labs., Inc. v. Dep Corp.*, 945 F. Supp. 547, 552 (S.D.N.Y.1996). This is not a case where marks are merely similar; Defendants applied to register the *identical* MOMA word mark and the MoMaCha Logo is virtually identical to the MoMA Logo in every aspect.

"[I]t is the general rule that one may not appropriate the entire mark of another and avoid a likelihood of confusion by the addition thereto of descriptive or otherwise subordinate matter." *Bellbrook Dairies, Inc. v. Hawthorn-Mellody Farms Dairy, Inc.*, 253 F.2d 431, 432 (C.C.P.A. 1958) ("Vita–Slim" confusingly similar to "Slim") (citation omitted); *see also N.Y. City Triathlon*, 704 F. Supp. 2d at 317 (addition of "Club" to plaintiff's "New York City Triathlon" marks likely heightened confusion); *Am. Express Co. v. Am. Express Limousine Serv.*, 772 F. Supp. 729, 733 (E.D.N.Y.1991) (addition of "Limousine Services" to "American Express" mark enhanced rather than dispelled confusion). But that is exactly what Defendants

have done.  The MoMA mark is completely subsumed within the MOMACHA mark; the only

difference is the addition of a descriptive term—the word "cha," historically meaning "tea" in

Chinese and Japanese and widely recognized as the root of all modern words for tea—to the

MoMA mark.  (Levitt Decl. Ex. I.)  This is insufficient to distinguish MoMaCha, and, in fact,

suggests that MoMA has launched a tea shop in conjunction with its MoMA-branded museum

and related amenities.  *See N.Y. City Triathlon*, 704 F. Supp. 2d at 317; *Am. Express Co.,* 772 F.

Supp. at 733.  That MoMA already has a number of satellite brands—the MoMA Design Store,

MoMA PS1, and MoMA QNS—makes that incorrect suggestion unavoidable.

The identity between the marks is also highlighted by the stunning similarity of the

MOMACHA logo to the MoMA Logo.



|  **MoMA Logo**  |  **Infringing MOMACHA Logo**  |

     

The black and white coloring is identical; the lowercase "o" between two capitalized "M's" is

identical; the use of extra-bold font derived from Franklin Gothic is identical.  (Baker Decl.

¶¶ 28-29.)  In fact, the single difference in the MOMACHA logo is the addition of the word

"cha," which still appears in identical coloring and font.  But, as explained above, "cha" is

merely descriptive of MoMaCha's services and therefore insufficient to dispel confusion.  *See*

*N.Y. City Triathlon*, 704 F. Supp. 2d at 317.  The use of graphic slanting lines in the

MOMACHA logo is similarly insufficient to distinguish the infringing mark.  *See id.* at 333-34

(word component of defendant's mark considered dominant and accorded greater weight in

assessing similarity, especially given design component merely augmented the impression

conveyed by the word).

Vertical displays of the parties' respective logos are also disturbingly identical:

**MoMA Logo**　　　　　　　　　　**Infringing MOMACHA Logo**

　　　　　　　

The MOMACHA Infringing Marks create an overall impression identical to that of the MoMA Marks and any differences between them are clearly insufficient to ward off confusion. *N.Y. City Triathlon*, 704 F. Supp. 2d at 336. This factor weighs resoundingly in MoMA's favor.

> *b.*　　*The services are closely related.*

Proximity of services is particularly significant in determining likelihood of confusion. *See Mobil Oil Corp.*, 818 F.2d at 258. "The relevant question is whether they are so 'related' that a reasonable buyer is likely to think that a defendant's goods or services are somehow connected with or sponsored by the plaintiff, due to similar marks." *Herbko Int'l, Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 1165-66 (Fed. Cir. 2002) ("Even if the goods and services are not identical . . . they may be sufficiently related in the mind of the consuming public to cause confusion concerning the source or origin of the goods and services.").

Here, MoMA and MoMaCha provide extremely closely related services—displaying works of modern art to the public in New York City. (Baker Decl. ¶ 21.) In addition to its own art exhibits, MoMaCha is affiliated with and housed within another contemporary art gallery, further ensuring that the consumers who patronize MoMaCha are the same modern and contemporary art enthusiasts who visit MoMA. (*Id.* ¶¶ 21-22.) MoMA and MoMaCha also

provide identical café services, offering desserts and beverages to patrons in the art gallery setting.  (*Id.* ¶ 18, Exs. 7-8; *id.* ¶ 21.)  MoMA and MoMaCha additionally offer retail services to those same art gallery patrons in connection with the very art that is on display in their respective venues.  (*Id.* ¶ 20, Ex 10; *id.* ¶ 23, Ex. 12.)  The close relationship of these goods and services all but ensures that patrons of MoMaCha will think that it is sponsored by or affiliated with MoMA.  Indeed, journalists and Defendants have acknowledged the perceived connection of MoMaCha to modern art and MoMA, discussed *infra* Section I.A.3.e.  MoMaCha's social media further supports the relatedness of services, as posts from MoMaCha customers are rife with hashtags like #museum, #artgallery, and #modernart.  (Levitt Decl. Exs. J-L.)  This factor strongly supports MoMA.

> c.    *MoMA's Marks are extremely strong.*

The third factor identified as being particularly significant in determining likelihood of confusion is the strength of the plaintiff's mark.  *See Mobil Oil Corp.*, 818 F.2d at 258.  "The strength of a trademark in the marketplace and the degree of protection it is entitled to are categorized by the degree of the mark's distinctiveness in the following ascending order: generic, descriptive, suggestive, and arbitrary or fanciful."  *Gruner*, 991 F.2d at 1075 (citation omitted).

The MoMA Marks are fanciful as they are made-up terms that "do not communicate any information about the product either directly or by suggestion."  *See Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 385 (2d Cir. 2005) (citation omitted).  They contain only the characters "MOMA," an acronym for the Museum's name, with no ordinary meaning and do not communicate any information about the variety of services being offered.  Such fanciful marks are considered "inherently distinctive" and are automatically entitled to protection.  *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992); *see also Lane Capital Mgmt., Inc. v.*

*Lane Capital Mgmt., Inc.*, 192 F.3d 337, 344 (2d Cir. 1999) ("Fanciful, arbitrary, and suggestive marks are deemed inherently distinctive. Their intrinsic nature serves to identify a particular source of a product, so they will be automatically protected."). The distinctiveness of the MoMA Marks is further strengthened by use of the proprietary font since 2003 and singular visual consistency. (Baker Decl. ¶ 13, Ex. 2.)

The longstanding and world-famous recognition of the MoMA brand makes consumer confusion even more likely, and entitles the MoMA Marks to heightened protection. *See Virgin Enterps.*, 335 F.3d at 148 (finding strong likelihood of confusion based on arbitrariness and fame of VIRGIN mark for airline, record megastores, and consumer electronics). This is because "[w]idespread consumer recognition of a mark previously used in commerce increases the likelihood that consumers will assume it identifies the previously familiar user, and therefore increases the likelihood of consumer confusion if the new user is in fact not related to the first." *See id.*; *see also McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1132 (2d Cir. 1979) (noting that secondary meaning may further enlarge the scope of protection accorded to inherently distinctive marks). Accordingly, this factor weighs heavily in favor of MoMA.

> d.       *Actual confusion between the parties' marks has occurred.*

"There can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion." *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 459 (2d Cir. 2004) (citation omitted). Courts agree that anecdotal evidence is sufficient to prove actual confusion. *See Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 319-20 (S.D.N.Y.), *aff'd*, 234 F.3d 1262 (2d Cir. 2000).

Defendants' use of the MOMACHA Infringing Marks has already caused confusion and will continue to cause confusion among consumers who are likely to believe that Defendants'

MoMaCha art gallery and café is affiliated with MoMA. In fact, MoMA is already aware of several instances of confusion. For example, MoMA's outside trademark counsel was contacted by an attorney who stated that "the style of the font and the display of the [MoMaCha] name looked so much like the familiar MoMA logo" that he could not confirm that MoMaCha was not affiliated with MoMA. (Levitt Decl. Ex. M.) There is also evidence that average consumers are confused, posting comments on social media indicating they believe beverages from MoMaCha to have originated with MoMA. (*Id.* Exs. K-L.) Such evidence "strongly supports a finding of likelihood of confusion." *Am. Ort, Inc. v. Israel*, No. 07 CV 2332(KMK), 2007 WL 2049733, at *8 (S.D.N.Y. July 17, 2007) (holding that actual confusion factor weighed in favor of plaintiff when "at least one of Plaintiff's donors has already been confused by Defendant's use of the ORT mark"). Because MoMA has presented evidence of actual confusion in the marketplace, this factor weighs heavily in MoMA's favor.

e.    *MoMaCha adopted the MOMACHA Infringing Marks in bad faith.*

The *Polaroid* factors also consider whether MoMaCha acted "with the intention of capitalizing on [the] plaintiff's reputation and goodwill and [on] any confusion between his and the senior user's product." *Savin Corp.*, 391 F.3d at 460 (citation omitted). That MoMaCha attempted to register the word mark "MOMA" leaves **no doubt** that MoMaCha adopted the MOMACHA Infringing Marks in bad faith—to trade off the recognition that MoMA has established in the field of modern and contemporary art. *See Simon & Schuster, Inc. v. Dove Audio, Inc.*, 970 F. Supp. 279, 299-300 (S.D.N.Y. 1997) (finding "intentional copying of plaintiff's mark" in light of "evidence that Dove copied plaintiffs' mark . . . to capitalize on plaintiffs' success and the goodwill associated with plaintiffs' mark"). Indeed, the identical nature of the marks alone, discussed above in Section I.A.3.a, *supra*, is itself evidence of bad

faith.  *See Metlife, Inc. v. Metro. Nat'l Bank*, 388 F. Supp. 2d 223, 234 (S.D.N.Y. 2005) (finding circumstantial evidence of bad faith in defendant's adoption of "MetBank" when plaintiff already used "MetLife," as "the similarity between the parties' marks [was] such that it strains credulity to believe that neither [defendant] nor the firm it hired to redesign its logo were not consciously influenced by the MetLife logo").  As in *Metlife*, it is not credible that the designer hired to design the MOMACHA logo—a New York-educated, professional artist who frequents the Museum and MoMA PS1 gallery (Levitt Decl. ¶ 16, Ex. N)—did so without influence of the MoMA Marks.  A comparison of the proprietary MoMA font overlaid onto the MOMACHA logo makes the deliberateness of MoMoCha's acts clear:

**Overlay of MoMA Font**          **MOMACHA Logo**

          

**(**Baker Decl. ¶ 29.)

Further, this is consistent with articles explaining the derivation of the MoMaCha mark— it is described as a combination of the words "MOMA" and "matcha" green tea, as a play on MoMA's name.  (*Id*. ¶ 32.)  One of Defendants' founders even conceded that MoMaCha "mashes art and matcha," implying that the MOMA portion of the name stands for art because it copies the MoMA mark used and owned by MoMA.  (*Id*.)  Other articles have noted Defendants' combination of tea and modern art: "MoMaCha Turns Green Tea Into a Modern Art Experience" published in *Beford + Bowery*, and "This Trippy Café Turns Your Matcha Experience into Modern Art," published in *Secret NYC*.  (*Id*. ¶ 32, Ex. 16.)  Other sources have also noted the

inescapable similarities between the MoMA Marks and the MOMACHA logo and questioned the affiliation between MoMA and the MoMaCha art-café. (*Id.* ¶ 33, Ex. 17.) Thus, this factor strongly favors MoMA.

> ### f. The relevant consumer group is not particularly sophisticated.

Under *Polaroid*, courts consider whether "'numerous ordinary prudent purchasers' would likely be 'misled or confused as to the source of the product in question because of the entrance in the marketplace'" of the new mark. *Savin Corp.*, 391 F.3d at 461 (citation omitted). Courts in this District are in agreement that "[t]he greater the value of an article the more careful the typical consumer can be expected to be." *See Narwood Prods., Inc. v. Lexington Broad. Servs., Co.*, 541 F. Supp. 1243, 1250 (S.D.N.Y. 1982) (citation omitted); *see also* 4 McCarthy on Trademarks and Unfair Competition, § 23:96, at 23 (5th ed. 2018) ("If the goods are expensive, the reasonably prudent buyer does not buy casually, but only after careful consideration. Thus, confusion is less likely than where the goods are cheap and bought casually.").

In this case, because the cost of a cup of tea is relatively minimal, and shopping in a design store or viewing art in galleries and exhibits is often free, MoMaCha's patrons are unlikely to devote much attention to ascertaining the source of the art venue or café they are visiting. And while there may be some consumers with greater sophistication, such as professional artists or their representatives, courts must consider the probability of confusion on the part of "both discriminating and casual, relatively unknowledgeable buyers." *Omega Importing Corp. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971). Here, the vast majority of visitors to MoMA and MoMaCha are travelers or casual consumers with limited financial stake and knowledge about the services they are consuming. As such, this factor also weighs heavily in favor of MoMA.

> g.    *The quality of MoMaCha's services is not equal to MoMA's.*

Under *Polaroid*, the "quality of goods and services" factor "generally considers whether the senior user's reputation could be tarnished by inferior merchandise [or services] of the junior user." *See N.Y. City Triathlon*, 704 F. Supp. 2d at 340 (quoting *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 483 (2d Cir. 1996). As discussed above, MoMA invests significant resources in its curatorial program to ensure that the art it displays contributes in a meaningful way to the ongoing dialogue between the established and the experimental, the past and the present, in an environment that is responsive to the issues of modern and contemporary art. (Baker Decl. ¶ 4.) The result is that MoMA has become one of the foremost sources of modern art ***in the world*** and has won numerous awards for its related offerings. (*Id.* ¶¶ 3-8.) While MoMA does not know what criteria MoMaCha uses when it selects and presents artwork, by definition it cannot be using the same criteria that MoMA's world renowned curatorial team has painstakingly developed and carefully applies to all its presentations. Thus, this factor weighs in favor of MoMA.

> h.    *The remaining Polaroid factor is not relevant.*

Likelihood that the prior owner will bridge the gap is inapplicable where the products or services are directly competitive. *See, e.g.*, *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009) (noting that "the 'bridging the gap' factor is irrelevant . . . where, as here, the two products are in direct competition with each other").

In sum, there is an overwhelming likelihood of confusion in this case. For this reason, MoMA has a strong likelihood of success on its infringement claims.

### B.  MoMA Is Likely To Succeed On Its Unfair Competition Claim

For unfair competition, "Plaintiffs must show a likelihood of confusion or deception of

the consuming public as to the source of the allegedly infringing product, *and* bad faith on the part of Defendants." *Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339, 363-64 (S.D.N.Y. 1998). As discussed above, *supra* Section I.A.3.d, MoMA has demonstrated not just a ***likelihood*** of confusion but ***actual*** confusion resulting from MoMaCha's use of identical marks. Also as detailed above, *supra* Section I.A.3.e, MoMaCha was clearly aware of the MoMA Marks, the MoMA brand being indisputably well-known and MoMaCha's designer having visited the Museum and affiliated MoMA PS1. *See Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1228 (2d Cir. 1987) ("[A]wareness [that a mark is in use] can give rise to an inference of bad faith."). Worse still, MoMaCha took deliberate steps to leverage MoMA's success, with its own founder acknowledging Defendants' reliance on the association of art and the MoMA Marks and applying to register the "MOMA" word mark. (Baker Decl. ¶ 32.) This evidence showing that MoMaCha intended to cause consumers to believe that MoMaCha and its services are affiliated with MoMA serves to establish bad faith on the part of MoMaCha. *See Philip Morris USA Inc. v. Felizardo*, No. 03 Civ. 5891(HB), 2004 WL 1375277, at *6 (S.D.N.Y. June 18, 2004) ("[T]he evidence [plaintiff] proffers to demonstrate [defendant's] intentional use of the counterfeit marks . . . also serves to establish [defendant's] bad faith under New York common law."). Having established likely and actual confusion, along with bad faith, to support its infringement claims, MoMA is also likely to succeed on its unfair competition claim.

### C. MoMA Is Likely To Succeed On Its Trademark Dilution Claim

To prevail on a claim of federal trademark dilution, a plaintiff must establish that: (1) the senior mark is famous; (2) the defendant is making use of the junior mark in commerce; (3) defendant's use of the junior mark began after the senior mark became famous; and (4) a likelihood of dilution. *Burberry Ltd. & Burberry USA v. Designers Imports, Inc.*, No. 07 Civ.

3997(PAC), 2010 WL 199906, at *7 (S.D.N.Y. Jan. 19, 2010).  MoMA satisfies each element.
The MoMA Marks are recognized the world over as the source of incomparable modern art and
related services.  It is undisputed that MoMaCha is using the MOMACHA Infringing Marks in
commerce, having recently opened its gallery and café.  (Baker Decl. ¶ 21.)  It is similarly
undisputed that the very recent launch of Defendants' services was long after the MoMA Marks
became famous.  (*Id.* ¶¶ 11-14.)

     As for the final element, likelihood of dilution may be established by blurring or by
tarnishment.  *See* 15 U.S.C. § 1125(c)(1).  Blurring is defined as an "association arising from the
similarity between a mark or trade name and a famous mark that impairs the distinctiveness of
the famous mark," *id.* § 1125(c)(2)(B), and may be found "regardless of the presence or absence
of actual or likely confusion, of competition, or of actual economic injury," *id.* § 1125(c)(1).
The Lanham Act provides six non-exclusive factors a court may consider when determining
whether a mark is likely to be diluted by blurring: (i) the degree of similarity between the mark
or trade name and the famous mark; (ii) the degree of inherent or acquired distinctiveness of the
famous mark; (iii) the extent to which the owner of the famous mark is engaging in substantially
exclusive use of the mark; (iv) the degree of recognition of the famous mark; (v) whether the
user of the mark or trade name intended to create an association with the famous mark; and (vi)
any actual association between the mark or trade name and the famous mark.  *Id.*
§ 1125(c)(2)(B)(i)-(vi).  As discussed above in Section I.A.3, *supra*, each factor demonstrates
that there is a likelihood that the MoMA Marks will cease to serve as a unique identifier for only
MoMA goods and services because of Defendants' conduct.  *See Nabisco, Inc. v. PF Brands,
Inc.*, 50 F. Supp. 2d 188, 201 (S.D.N.Y.), *aff'd*, 191 F.3d 208 (2d Cir. 1999).

     The tarnishment of the MoMA Marks is also likely, as MoMA will certainly suffer a

negative association with the quality of services offered by Defendants, as noted above in

Section I.A.3.g.  *See* 15 U.S.C. § 1125(c); *see also Burberry Ltd. v. Euro Moda, Inc.*, No. 08 Civ.

5781(CM), 2009 WL 1675080, at *13-14 (S.D.N.Y. June 10, 2009) (describing dilution by

tarnishment and finding that defendants had tarnished plaintiff's marks).  In fact, there has

already been at least one artist who believed MoMaCha was misappropriating his or her work

(Levitt Decl. Ex. M); that is exactly the type of negative association MoMA seeks to avoid.

Thus, MoMA is also likely to prevail on this claim.

## II.   MOMA WILL CONTINUE TO SUFFER IRREPARABLE HARM IF MOMACHA IS NOT ENJOINED

> Although irreparable harm may not be presumed upon a showing
> of a likelihood of success, irreparable harm exists in a trademark
> case when the party seeking the injunction shows that it will lose
> control over the reputation of its trademark . . . because loss of
> control over one's reputation is neither calculable nor precisely
> compensable.  Thus, it will often be the case that a party's
> demonstration of a likelihood of success on a trademark claim will
> also show a threat of irreparable harm.

*NYP Holdings v. N.Y. Post Publ'g Inc.*, 63 F. Supp. 3d 328, 341 (S.D.N.Y. 2014)

(quotations and citations omitted); *see also Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F. Supp.

2d 489, 503 (S.D.N.Y. 2013) ("[A] party's demonstration of a likelihood of success on an

infringement claim often foretells a finding of irreparable harm.").  Thus, while irreparable

harm is not presumed as a matter of law, it is evident from MoMA's strong showing that it will

succeed on each of its claims.  In particular, the strong showing of likelihood of confusion

between the MoMA Marks and the MOMACHA Infringing Marks, as evidenced by the

*Polaroid* factors, weighs heavily in favor of finding irreparable harm to MoMA.  *See Marks*

*Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 334 (S.D.N.Y. 2011) ("[A] particularly strong

likelihood of confusion should weigh in favor of finding irreparable injury.").

### A.  Actual Confusion Has Caused MoMA Irreparable Harm and Will Continue To Do So Unless MoMaCha Is Enjoined

Absent an injunction, MoMA will continue to suffer irreparable harm to its reputation as MoMA has already faced numerous instances of actual confusion. *See Marks Org., Inc.*, 784 F. Supp. 2d at 335 ("[W]here the likelihood of confusion is so high, it is impossible to disaggregate lost good will from confusion. . . . The extreme likelihood of confusion (as well as evidence of actual confusion) makes it clear that Plaintiff has lost good will because of this confusion."). The risk of diminishing its pristine reputation in the art world, and also the support of artists and their representatives, would irreparably harm MoMA.

Moreover, average consumers of gallery and café services, like those that frequent Instagram, have already expressed confusion as a result of MoMaCha's unfair conduct. (Levitt Decl. Exs. K-L.) Such confusion has even included the assumption that a MoMaCha beverage made with a marijuana-derived additive was actually being served at MoMA. (*Id.* Ex. L.) This actual confusion is harming MoMA's goodwill in the marketplace. *See N.Y. City Triathlon*, 704 F. Supp. 2d at 343 ("[p]rospective loss of . . . goodwill alone is sufficient to support a finding of irreparable harm") (citing *Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F. 3d 27, 37-38 (2nd Cir. 1995)). MoMaCha's unauthorized use of an identical and confusingly similar mark for competing and closely related services severely hinders MoMA's ability to ensure that consumers associate its MoMA mark only with its quality services. *N.Y. City Triathlon*, 704 F. Supp. 2d at 325 (holding that plaintiff established irreparable harm where "Defendant [was] not only trading on Plaintiff's earned goodwill, but also [was] taking from Plaintiff the ability to control its reputation and the services offered under its name and mark").

Because so many individuals have already been, and will continue to be, confused between MoMA and MoMaCha, MoMA's reputation is likely to be tainted by Defendants. As discussed in Section I.A.3.g, *supra*, the quality of MoMaCha's services cannot equal MoMA's award-winning museum and exhibition spaces. The goodwill MoMA has accumulated through its exceptional services is being tarnished by marketplace confusion between MoMA and MoMaCha, which constitutes irreparable harm. *See Vox Amplification Ltd. v. Meussdorffer*, No. CV 13-4922(ADS)(GRB), 2014 WL 558866, at *15 (E.D.N.Y. Feb. 11, 2014) (holding

counterclaimants had established loss of goodwill—and thus likelihood of irreparable harm—when counterdefendants sold a lower-quality guitar using similar mark).

As a result of a loss of both reputation and goodwill, MoMA is suffering irreparable harm from MoMaCha's infringement and dilution of its MoMA Marks. Unless MoMaCha is enjoined, MoMA will continue to suffer irreparable harm.

### B. In Addition to Actual Confusion, There Is a Strong Likelihood of Confusion, Which Will Cause Irreparable Harm if MoMaCha Is Not Enjoined

"[I]rreparable injury may be found where 'there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question.'" *Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 43 (2d Cir. 1986) (quoting *Joseph Scott Co. v. Scott Swimming Pools, Inc.*, 764 F. 2d 62, 66 (2d Cir. 1985)). Because the marks in this case are so extraordinarily similar, Section I.A.3.a *supra*, and the services provided are competing and closely related, Section I.A.3.b *supra*, there is a strong chance that modern art enthusiasts and New York City visitors will be misled or confused as to whether Defendants' gallery and café are affiliated with MoMA. *See, e.g.*, *Narwood Prods., Inc.*, 541 F. Supp. at 1251. Individuals may also confuse MoMA's and MoMaCha's advertising and promotional materials, websites, news articles, retail products, and social media. If Defendants are not enjoined from using the MOMACHA Infringing Marks, it is very likely that individuals will be misled regarding the source of Defendants' services, which constitutes an irreparable harm to MoMA.

### III. MOMA HAS RAISED SERIOUS QUESTIONS ON THE MERITS OF ITS CLAIMS AND THE BALANCE OF HARDSHIPS TIPS IN ITS FAVOR

A court may issue a preliminary injunction not only where the moving party has established a likelihood of success on the merits, but also where there are "sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of

hardships tipping decidedly [in the movant's favor]." *Louis Vuitton Malletier v. Burlington Coat Factory*, 426 F.3d 532, 537 (2d Cir. 2005) (citation omitted).

Filing this lawsuit was not done lightly. This is, in fact, the first time MoMA has needed to seek court intervention to protect its brand. (Baker Decl. ¶ 35.) But the harm to MoMA in the absence of an injunction will be so severe that MoMA had to act quickly. If MoMaCha is permitted to continue its unfair competition and infringing conduct, MoMA will suffer irreparable harm to its reputation and goodwill. In contrast, if enjoined from using the MOMACHA Infringing Marks, MoMaCha will suffer, at most, economic costs associated with changing its name and updating any promotional materials and social media platforms. Any such harm is entirely attributable to MoMaCha's deliberate decision to imitate MoMA's trademarks. *See, e.g.*, *Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb, Inc.*, 698 F.2d 862, 867 (7th Cir. 1983) ("[O]ne entering a field already occupied by another has a duty to select a trademark that will avoid confusion." (citation omitted)). Where the movant will suffer uncompensable harm, while the infringer is harmed only economically, the Second Circuit finds that the balance of hardships tips decidedly in the movant's favor. *See, e.g.*, *Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3, 8 (2d Cir. 1996). Thus, MoMA meets this alternative standard because the balance of hardships tips overwhelmingly in its favor and, as discussed above in Section I.A, *supra*, the facts put forth by MoMA demonstrating likely success on the merits serve to raise serious questions as to the merits.

## CONCLUSION

For the foregoing reasons, MoMA respectfully requests that the Court preliminarily enjoin Defendants from using, displaying, or promoting the MOMA or MOMACHA marks, and the https://momacha.com/ domain name, during the pendency of this action.

Dated: April 20, 2018

MORRISON & FOERSTER LLP

By:  _s/ Jamie A. Levitt___

Jamie A. Levitt
250 West 55th Street
New York, New York  10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Email: JLevitt@mofo.com


Jennifer Lee Taylor (*pro hac vice* forthcoming)
Sabrina A. Larson (*pro hac vice* forthcoming)
425 Market Street
San Francisco, California  94105
Telephone:  (415) 268-7000
Facsimile:  (415) 268-7522
Email: JTaylor@mofo.com
         SLarson@mofo.com


Attorneys for Plaintiff
THE MUSEUM OF MODERN ART